UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DONALD RAYNOR

               Plaintiff,

  -against-

THE CITY OF HARTFORD, WILLIAM SIEMIONKO,
BRIAN PLOURDE, MARK ROSTKOWSKI, ANDREW
JACOBSON, JAMES STEPHENSON, JOHN AND JANE
DOES #1-10, as police officers/detectives for the City of
Hartford

               Defendants.

**COMPLAINT**

Civil Case No.: _____

**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1.      On June 14, 2013, Donald Raynor, then twenty-seven years old, was arrested and charged with the murder of Delano Gray.  He was incarcerated, separating him from his family.[1]

2.      The arrest warrant, secured by Detectives Mark Rostkowski and William Siemionko, was largely premised on the statements of a cooperating witness, Jose Rivera ("Rivera"), and the firearms analysis by the State's forensic firearms expert, James Stephenson. These two components were fundamental to the State's case, for without them the State would have lacked probable cause to have even obtained a warrant for Mr. Raynor's arrest.

3.      At the time of the trial leading to Mr. Raynor's conviction, two critical pieces of evidence had not been disclosed to the defense.  One, that Rivera, whose testimony was that he drove the vehicle from which Mr. Raynor shot and killed Delano Gray, had given a statement to law enforcement that he was never present for any shooting committed by Donald Raynor.  Two,

---

[1] Mr. Raynor was charged in multiple cases, but the murder case was the primary factor in his inability to post bond.

1

that there was evidence that James Stephenson, the State's firearms expert, had manipulated database search results which, if disclosed, would have been material to the defense's cross-examination of Stephenson at trial.

4.      The first trial resulted in a mistrial.  The second trial resulted in a conviction and a sentence of sixty years.  The Connecticut Supreme Court, recognizing the limited evidence proffered by the State and the prejudicial nature of some of the key evidence admitted at trial, reversed and remanded the case to the trial court for further proceedings.

5.      In March 2024, Mr. Raynor proceeded to trial for a third time.  On this occasion, defense counsel was armed with exculpatory evidence, particularly as it related to Rivera.  On March 11, 2024, the jury returned a not guilty verdict and Mr. Raynor was released from prison.

6.      As detailed herein, the HPD has a longstanding custom and practice of withholding exculpatory evidence in serious felony cases.  This unconstitutional pattern of violations of *Brady v. Maryland*, 373 U.S. 83 (1963) has led to the wrongful convictions of several men in Hartford, Connecticut, including Alfred Swinton, Miguel Roman, Hubert Thompson, Derrick Taylor, Charles Williams, and James Tillman.  In each case, the HPD suppressed material evidence that was favorable to the defense, which resulted in innocent men being convicted and incarcerated.

7.      The City of Hartford and HPD policymakers have long been on notice of these deficiencies, and the pattern and practice of *Brady* violations by Hartford police.  Nevertheless, they have deliberately failed to take any meaningful corrective action.  In 2011, an independent audit of HPD's Internal Affairs Division (IAD) revealed widespread failures to properly investigate citizen complaints, missing IAD files, and lack of compliance with a federal consent decree requiring timely investigations.  The City of Hartford and the HPD were on notice of the grave deficiencies in supervision and discipline that resulted officer misconduct, yet they failed to

implement any recommended reforms or otherwise address the systemic issues plaguing the department.

8.      The Defendants in this case are yet another example of the HPD's practice of engaging in *Brady* violations and, by extension, depriving these individuals of their rights to due process.  Defendants William Siemionko, Brian Plourde, Mark Rostkowski, and Andrew Jacobson were all HPD officers and detectives who had in their possession or were aware of clear exculpatory evidence from the only proffered witness to the crime charged: Jose Rivera.  Jose Rivera, a known gang member who had killed and shot multiple people, including children, and who openly acknowledged his willingness to cooperate to secure a reduced prison sentence and a lucrative financial award for providing information against Mr. Raynor.

9.      The State, in prosecuting Mr. Raynor, also placed primary emphasis on the forensic work of Defendant James Stephenson, who was then employed by the Connecticut Forensic Lab.  As discussed herein, Mr. Stephenson manipulated his results as he has done in multiple other instances and was thereby deliberately indifferent to the due process rights of Mr. Raynor and the other defendants who were wrongfully convicted by his misconduct.

10.     But for the deliberate indifference of the City of Hartford and the Hartford Police Department, the investigating officers, and James Stephenson, Mr. Raynor would not have been convicted of the murder of Delano Gray.  By this complaint, he seeks relief for his wrongful conviction.

**<u>PARTIES</u>**

11.     Plaintiff Donald Raynor is a forty-year-old man.  He is a citizen of the United States and resides in Connecticut.

12.     Defendant City of Hartford is a municipal organization organized under the laws of the State of Connecticut.  At all relevant times, its Department of Police Services (the Hartford Police Department or "HPD") was responsible for investigating criminal offenses that occurred within the city.

13.     Defendant William Siemionko was, at the relevant times, a detective in the HPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of Hartford and the HPD.  He participated in the investigation that resulted in Mr. Raynor's arrest, prosecution, and conviction. Defendant Siemionko is named in his individual capacity.

14.     Defendant Brian Plourde was, at the relevant times, a detective in the HPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of Hartford and the HPD.  He participated in the investigation that resulted in Mr. Raynor's arrest, prosecution, and conviction.  Defendant Plourde is named in his individual capacity.

15.     Defendant Mark Rostkowski was, at the relevant times, a detective in the HPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of Hartford and the HPD.  He participated in the investigation that resulted in Mr. Raynor's arrest, prosecution, and conviction. Defendant Rostkowski is named in his individual capacity.

16.     Defendant Andrew Jacobson was, at the relevant times, a detective in the HPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of Hartford and the HPD.  He

participated in the investigation that resulted in Mr. Raynor's arrest, prosecution, and conviction. Defendant Jacobson is named in his individual capacity.

17.     Defendant James Stephenson is a firearms examiner who was formerly employed by the Connecticut State Police Forensic Science Laboratory.  At all relevant times, he was acting within the scope of his employment with the State of Connecticut and under color of state law. Upon information and belief, he is now retired from government employment and working as a consultant.  Defendant Stephenson is named in his individual capacity.

18.     Defendants John and Jane Doe, whose true identities Plaintiff has been unable to ascertain despite reasonable efforts to do so, were individual and supervisory officers of the HPD, acting under color of state law, actually and/or apparently within the course and scope of his/her duties as employees of the HPD.  They are sued in their individual capacities, and in their official capacities as policy makers for the City of Hartford.

## JURISDICTION AND VENUE

19.     This action arises under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.

20.     The Court has subject matter jurisdiction over Plaintiff's federal law claims under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because the claims arise under the laws of the United States and allege the deprivation of constitutional rights.

21.     The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(b).

22.     Venue lies in this Court under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**JURY DEMAND**

23.     Plaintiff demands trial by jury.

**FACTS**

**I.      The Murder of Delano Gray: The Investigation**

24.     On June 18, 2007, Delano Gray was shot and killed on Enfield Street in Hartford, Connecticut.

25.     Alisha Stevens, who was with Gray at the time he was shot, told police that she did not see the shooter.  She advised HPD officers that she heard a vehicle stop, then heard gunshots. She saw a white, boxy vehicle drive away.

26.     HPD collected a number of casings at the scene, which were submitted to the Connecticut State Crime Lab for analysis.  At that time, no firearm had been retrieved so the lab could only conduct its analysis on the casings that had been collected.  The analysis was therefore limited to taking pertinent measurements of the spent shell casings and running them through available databases to determine the type of firearm used.

27.     Almost thirteen months after the murder, on July 16, 2008, Hartford police and task force officers, apparently relying solely on a tip from a confidential informant,[2] recovered a .223 Kel-Tec SU-16 assault rifle from a cache of weapons found in a duffle bag behind a garage of a gang member in the North End of Hartford.

28.     On July 23, 2008, the seized firearms were sent to the Connecticut State Crime Lab. Gerard Petillo compared the casings seized from the Gray shooting to the Kel-Tec rifle and determined that they were fired from the seized rifle.

---

[2] During the initial trials, defense counsel sought the identify of this confidential informant, but the trial court denied the request.

29.     On August 25, 2011, HPD officers, including Defendants Plourde and Rostkowski, in conjunction with federal officers, including DEA Special Agent Pete Borysevicz, stopped and searched Jose Rivera as he was leaving a storage facility.  A search of Rivera's vehicle uncovered a .223 caliber firearm that was believed to have been used in the murder of Angel Gomez.  Rivera was arrested and charged with criminal possession of a firearm and detained on a two-million-dollar bond.  The arrest was part of an ongoing investigation conducted as a joint effort of federal agencies such as the ATF and DEA, and the Hartford Police Department.  Upon information and belief, one or more of the defendants was cross designated as Task Force Officers through the course of investigation, meaning they cooperated closely with their federal counterparts and shared information as part of their joint effort.

30.     On that date, Rivera gave multiple sworn statements to Plourde and Borysevicz, confessing to multiple murders, including the July 1, 2011, murder of Angel Gomez,[3] the August 9, 2008, manslaughter of Zeke Roberts, and the shooting of four children at the West Indian Day parade.  In total, Rivera had shot and killed multiple people and wounded many more, including children as young as seven-years-old.  He also provided statements inculpating others in homicides and shootings in Hartford, including but not limited to Willie Wilson, with whom he also claimed to commit murder.  *See State v. Willie Wilson*, Docket no. HHD-CR13-0667528.

31.     Pertinent to the instant case, he also gave statements about Mr. Raynor, specifically stating that Mr. Raynor was responsible for the drive-by shooting of Delano Gray, and that Rivera had been the driver of the vehicle.

---

[3] Defendants Plourde and Rostkowski, along with Special Agent Pete Borysevicz, were involved in the search and subsequent arrest of Rivera.  On September 30, 2011, Defendants Jacobson and Siemionko obtained an arrest warrant for Rivera charging him with the murder of Angel Gomez.

32.     Rivera's express purpose in providing this information was to receive leniency for the multiple homicides and assaults he had committed, and the cooperation agreement he subsequently signed with the State offered him that leniency.  As the Delano Gray case was a cold case that brought a reward to anyone who furnished information, he was also seeking the $50,000 award that would have been an additional benefit from the information he provided.

33.     In the course of these interviews, Rivera told law enforcement the following:

a.  That approximately a week prior to the murder, Mr. Raynor told him Mr. Gray shot at him.  Rivera further recounted that several days before the incident, Rivera and Mr. Raynor went to a Jamaican restaurant that was in the territory of the Ave, a rival gang.  Rivera claimed that on their way out of the restaurant, Gray passed them and Rivera thought there might be trouble.  As they left the parking lot, Rivera claimed that Gray took a photo of them on his cellphone.  It was at this point, according to Rivera, that Mr. Raynor indicated that Gray "has got to go."

b.  That on June 18, 2007, Rivera claimed that he was selling drugs on Bedford Street when Mr. Raynor called and said he was going to pick him up.  Raynor also purportedly told Rivera that he wanted to try out a .223 assault rifle on an "Avenue" person.  Shortly thereafter, Rivera relayed that he got in Mr. Raynor's car, and they drove to Mr. Raynor's apartment building where Mr. Raynor put on purple latex gloves, retrieved a .223 Kel-Tec assault-style rifle from the trunk of a disabled, unregistered car, and loaded it with an ammunition clip.  Mr. Raynor then proceeded to lie down in the

backseat and Rivera started driving toward what was known as the Ave territory.

 c. That as Rivera was driving down Enfield Street, Rivera saw a man and a woman talking on the street and mentioned to Mr. Raynor that it looked like Gray. Mr. Raynor sat up with the weapon and Rivera slowed down the car so that Raynor could shoot Gray out the back window. Rivera claimed the car slowed, and that Gray dropped when he was hit.

34. On September 27, 2012, Rivera entered into an Agreement Concerning Prosecution with the State's Attorney's Office. In that agreement, the State agreed to consent to the filing of a sentence modification in the cases that had resulted in his sentence of 42 years; to recommend that any sentence imposed in any other pending case be run concurrent to his existing sentence; and to share his cooperation with other law enforcement agencies. Rivera agreed to "truthfully disclose all information pertaining to his criminal activities and/or the criminal activities of others, as these activities relate to matters about which the State of Connecticut and any investigating police officer or agency requires of him."

35. The investigation continued following Rivera's disclosures. The Crime Lab matched casings retrieved from an unrelated shooting on Baltimore Street (hereinafter referred to as the "Baltimore Street shooting") to the Kel-Tec Rifle that the lab had linked to the Delano Gray murder, and which Rivera had linked to Mr. Raynor.

36. The Baltimore Street shooting took place on February 16, 2008. Early that morning, Debra Parker and Daryl Spence were getting out of their car outside their home after a night out drinking. Parker saw two men 100 feet up from their home who emerged from the shadows and stood under a streetlight. Both men were wearing dark clothing; one was taller than

the other.  As she got out of the car, she heard a shot and two men began to shoot at them, one firing a rifle.  No one was injured.  Police located twenty-two .223 caliber shell casings and seven .45 caliber casings.

37.    Immediately after the shooting, Parker gave police a vague description of the shooters, said she did not know who they were, and indicated she was not sure she would be able to identify them.  Later that morning, however, her son, who had stopped by the house, reported that he got in a fight at a concert the night before and showed Parker a photo he found on the internet from the concert.  The photo was of Mr. Raynor and Zeke Roberts, with whom her son claimed to have had a fight.   Parker called the HPD around to inform them about the fight and the photo, explaining she believed it may have led to the shooting.  She did not make any claims that the assailants were in the photo she saw.[4]

38.    In April 2011, Parker's son was killed in a shooting.  Police investigated but came up with no leads, so the case went cold.

39.    On August 24, 2011, Defendants Siemionko and Jacobson brought Parker to the police station on the premise that she was there to talk about her son's murder.  Defendants Siemionko and Jacobson quickly turned the conversation to the February 2008 shooting and asked whether she wanted to pursue the shooting case.  For the first time, three and a half years after the shooting, she gave a statement to police identifying Mr. Raynor and Roberts as the shooters.

40.    On June 5, 2013, Detectives Rostkowski and Siemionko served as affiants for the arrest of Donald Raynor for the Gray murder.  In that arrest warrant, Rostkowski and Siemionko attested to the following pertinent facts:

_____

[4] Notably, Mr. Raynor did not fit the initial description that she had provided to police.  Parker described the shorter of the two suspects as being 5'9" and 180 pounds, where Mr. Raynor at that time was 5'5" and 130 pounds.

a. That a report from the Connecticut Forensic Science Laboratory Firearms Section confirmed that the .223 caliber Kel Tec rifle seized on July 16, 2008, matched casings from the murder scene of Delano Gray;

b. That a report from the Connecticut Forensic Science Laboratory Firearms Section confirmed that the .223 caliber Kel Tec rifle seized on July 16, 2008, matched casings from the Baltimore Street shooting;

c. That a confidential co-conspirator (Rivera) confessed to driving a car while Raynor shot and killed Gray.

41.    On June 14, 2013, Donald Raynor was arrested and charged with murder, conspiracy to commit murder, and criminal use of firearm.  He remained incarcerated following his arrest.

## II.    The First and Second Trial

42.    The first trial proceeded in August and September 2014.

43.    At the time of the first trial, the State had produced numerous statements from Rivera, including statements dated 8/25/11, 1/18/12, 7/2/12, 8/1/12, 8/14/12, 8/20/12, and 9/27/12, as well as several transcripts from when Rivera testified in front of a State Grand Jury.  Trial counsel cross-examined Rivera extensively about these statements, highlighting the inconsistencies between them.

44.    The State also introduced, over defense counsel's objection, evidence of the Baltimore Street shooting.  At trial, Parker described the course of events very differently.  At that time, she claimed that in the morning, she observed her kids looking at picture on the computer from a concert, and that one of the photos happened to depict Mr. Raynor and Zeke Roberts.  She testified that at that time, she recognized the two men as the individuals who shot her earlier that

morning.  Her kids told her the identities of the individuals in the photo.  She testified that she called Detective Rivera with this information and told him where to locate the photo on the internet.  Parker claimed that Rivera never got back to her, so she dropped it.  Detective Rivera, however, wrote in his report that Parker refused to give a statement about the photo, so he took no further action.

45.     As to James Stephenson, the firearms examiner, defense counsel had moved for a hearing pursuant to *State v. Porter*, 241 Conn. 57 (1997) to challenge the admissibility of Stephenson's expert conclusions that the Kel-Tec rifle seized in 2008 fired the shell casings retrieved from the Delano Gray murder and from the Baltimore Street shooting.  The trial court denied the request for a hearing.

46.     Stephenson was permitted to testify that twelve of the fifteen shell casings from the Gray case were fired from the .223 Kel-Tec rifle.  He also testified that the same Kel-Tec rifle was used to fire seventeen of the twenty-two .223 casings seized from the Baltimore Street shooting.

47.     At the close of evidence, the jury was unable to agree on a verdict.

48.     Jury selection for the second trial began on February 9, 2015, and evidence began on March 11, 2015.  The State proceeded on the same evidence, relying heavily on the testimony of Rivera and Stephenson.  On March 23, 2015, the jury returned a guilty verdict on murder.

49.     On April 20, 2015, the trial judge sentenced Mr. Raynor to sixty years in prison.

50.     On September 8, 2015, Mr. Raynor appealed his conviction to the Connecticut Appellate Court, which affirmed the conviction and rulings of the trial court.  The Connecticut Supreme Court granted *certiorari*, reversed the conviction and remanded for further proceedings.

51.     In so deciding, the Supreme Court held that (1) the trial court erred by denying the defense's request for a *Porter* hearing on the reliability of ballistics evidence, and (2) the trial court

erred in denying the defendant's motion to exclude uncharged misconduct evidence related to the Baltimore Street shooting. The Court took note of the fact that the State's entire case rested on the testimony of Rivera and that of Stephenson. As the Connecticut Supreme Court noted in its decision reversing and remanding Mr. Raynor's conviction, Stephenson's testimony was "the only objective evidence that connected the casings found at the Enfield Street murder with the .223 caliber Kel-Tec assault rifle recovered by the police," such that the exclusion of his testimony would have made the case "much weaker." *State v. Donald Raynor*, 337 Conn. 527, 544-45 (2020). This was particularly true since "Rivera…had both a motive to testify falsely and credibility issues." *Id.* at 546.

52.     The Connecticut Supreme Court also held that the testimony concerning the Baltimore Street shooting was unduly prejudicial, and should have been precluded at trial:

> The probative value of the Baltimore Street shooting was too low to overcome its prejudicial impact. The Baltimore Street shooting occurred eight months after the Enfield Street murder. There was no evidence to suggest that the Baltimore Street shooting was motivated by or related to the earlier Enfield Street murder. They were separate shootings and, with the exception of the defendant, involved different participants and unrelated victims. Parker's testimony relating to the Baltimore Street shooting was admitted to prove that the defendant had been involved in this separate, subsequent gun related crime, where the shell casings matched the .223 caliber Kel-Tec assault rifle. Evidence that the defendant was involved in a shooting in which he allegedly used the same weapon only minimally increased the probability that he was the shooter who used that weapon eight months prior during the Enfield Street murder. This connection is further eroded by the fact that the .223 caliber Kel-Tec assault rifle was not recovered at the scene of the Baltimore Street shooting but, instead, five months later from a different location following a lead provided by a confidential informant. The state did not need to introduce evidence of the Baltimore Street shooting to connect the defendant to the .223 caliber Kel-Tec assault rifle used in the Enfield Street murder that the police subsequently recovered from a different location. The state presented direct evidence from Rivera connecting the defendant to that gun and the Enfield Street murder. Having reviewed the record in the present case, we conclude that the prejudicial effect of the uncharged misconduct unduly exceeded its probative value.

*State v. Donald Raynor*¸ 337 Conn. 527, 565 (2020).

## II.    The Third Trial: Discovery of Exculpatory Statement by the Lone Witness

53.    New trial counsel handled the third trial following the remand by the Connecticut Supreme Court.

54.    As part of his preparation for trial, defense counsel asked the State to produce a copy of all exhibits to the Connecticut Grand Jury in 2012 and 2013, at which Rivera testified. Prior counsel was aware that August 2011 was not the first time that Rivera had spoken to law enforcement about Mr. Raynor and his involvement with firearms. For instance, he had spoken to Detective Plourde and Special Agent Borysevicz of the DEA following his arrest for narcotics on January 8, 2009, relative to a larger investigation that was being conducted by the HPD in conjunction with the ATF and the DEA.

55.    Yet, new trial counsel discovered a document that had not been produced in advance of the first and second trial: a report dated May 13, 2009, documenting an interview by federal agents, including ATF Special Agent Mark Essing, about Mr. Raynor and the purchase of firearms and narcotics. ATF Special Agent Essing was part of the larger Money Green Bedrock Gang Investigation and, upon information and belief, testified before the Connecticut Grand Jury. The proffer statement reflects that although Rivera claimed, without detail, that Raynor was responsible for other shootings, Rivera stated that he was *not present* for any of the shootings, and that he did not know if anyone was injured.

56.    This proffer statement, which was not produced to prior trial counsel, yet which was known to Defendants Siemionko, Plourde, Rostkowski, and Jacobson by virtue of their involvement in the joint investigation, was clearly exculpatory. The interview occurred two years after Gray was shot, and before Rivera was facing multiple charges of murder and assault with a firearm. Rivera's assertion that he was "not present" for "any" shootings allegedly done by Mr.

Raynor and that he did not know if anyone was injured completely contradicted his lengthy testimony that he was not only present, but also that he conspired with Mr. Raynor to shoot and kill Delano Gray.

### III.    The Third Trial: Discovery of Exculpatory Evidence Regarding the State's Firearms Expert

57.    James Stephenson testified at the first and second trial on behalf of the State for work he performed while employed by the State.

58.    By statute, the role of the State Police Forensic Science Laboratory was to provide "technical assistance to law enforcement agencies in the various area of scientific investigation." Conn. Gen. Stat. § 29-7b (1999).  The lab was authorized to investigate physical evidence upon request of state or local law enforcement agencies.

59.    Defense counsel requested all bench notes for the firearms analysis conducted by Petillo and Stephenson, which revealed additional evidence that would have been fundamental to the defense's cross-examination of Stephenson.  These documents, which were produced in March 2023, had not been disclosed to prior trial counsel.

60.    The bench notes revealed that on June 18, 2007, investigators recovered casings from the Gray shooting.  Gerard Petillo examined those bullets on or about November 19, 2007, and from one of the casings, he extracted measurements of "LEA" and "GEA" (which, upon information and belief, correspond to measurements of the land and grooves).  The Land Range (LEA) was measured at 0.045-0.049 and the Groove Range (GEA) was measured at 0.066-0.067. Using a .003 +/- margin of error, Petillo entered these parameters into the General Rifling Characteristics, or GRC, database, to determine the firearm from which the casings may have been fired.  The search produced twelve possible firearms, *none of which* were a Kel-Tec rifle that

Rivera claimed was used as the murder weapon.  In Petillo's notes, he indicated "See GRC printout for list of firearms that may have fired this bullet."

61.     Petillo later compared the casings to the Kel-Tec, once seized in June 2008, and determined that the cartridges matched the firearm, and that the firearm was also a match to the cartridges from the Baltimore Street shooting.  Since Petillo was deceased at the time of trial, Stephenson testified to these results at the first and second trial.

62.     Later obtained documents, however, revealed that on July 10, 2014—after Rivera had been arrested and spoken to law enforcement—Stephenson conducted a second search of the GRC database.  A screenshot from a GRC database search dated July 10, 2014, showed two lines of results and included Kel-Tec rifles.  The lines also included the "Groove" and "Land" ranges for that firearm, but now the parameters entered were 0.037-0.040 for the Land Range and 0.072-0.075 for the Groove range, both of which were outside the measurements (and the margin of error) used in Petillo's 2007 search.  Based on the documents produced, Stephenson conducted the search and expanded the parameters for the search so that it would include the Kel-Tec rifle.

63.     At the time Stephenson conducted that search, he was aware that law enforcement had seized a Kel-Tec rifle, and inevitably received additional information that a cooperating witness had tied Mr. Raynor and a Kel-Tec rifle to the Delano Gray murder.

64.     The bench notes, invoices, and GRC search results raised significant questions about Petillo and Stephenson's methodology, which would have been fundamental to the defense's cross-examination of Stephenson.  Those questions would have included, but not been limited to, why measurements in 2007 did not match the Kel-Tec measurements in the GRC database, and

whether Stephenson merely worked backward once he knew that a Kel-Tec rifle had been identified by Rivera to ensure the GRC database showed a match.[5]

65.    Stephenson has also been accused by two other defendants of *Brady* violations that led to their wrongful convictions. *See Horn v. Stephenson,* 11 F.4th 163 (2d Cir. 2021) (affirming denial of Stephenson's motion to dismiss on qualified and absolute immunity grounds where he failed to disclose exculpatory GRC results, a fact that Stephenson acknowledged in the course of the litigation); *Carmon v. Commissioner of Correction*, Docket No. NNH-CV20-6107902 (holding that Stephenson's failure to disclose bench notes and fact that he conducted multiple queries of the GRC database constituted a *Brady* violation warranting a new trial).

66.    In reversing Mr. Raynor's conviction, the Connecticut Supreme Court acknowledged that the State's case rested almost entirely on the testimony of Rivera and Stephenson.  As the Court noted, "[t]here is no doubt that Stephenson was important to the state's case; his testimony was the only objective evidence that connected the casings found at the Enfield Street murder with the .223 caliber Kel-Tec assault rifle recovered by the police."  *Raynor*, 337 Conn. at 544-45.  The Court went on to conclude the following in holding the prejudice of the denial of a *Porter* hearing:

> The exclusion of Stephenson's expert testimony would have made the state's overall case against the defendant much weaker because Stephenson corroborated the testimony of Rivera, the only witness to identify the defendant as the shooter. Without Stephenson's expert testimony, the state would have relied primarily on Rivera's testimony related to the Enfield Street murder.  Rivera was also the sole

---

[5] These documents also relate to concerns about the reliability of ballistics matching, which was the subject of the motion seeking a *Porter* hearing.  Courts have continued to question the scientific validity of the field of ballistics identification, particularly given the subjective nature of the analysis and the lack of a defined error rate.  *See generally*, President's Council of Advisors on Science and Technology ("PCAST Report") (report from an advisory group of the Nation's leading scientists and engineers who directly advise the President and the Executive Office of the President, which determined that firearms analysis "still falls short of the scientific criteria for foundational validity.").

witness to testify that the defendant and the victim had a confrontation in the week leading up to the murder, to identify the defendant as the shooter on Enfield Street, to confirm that the .223 caliber Kel-Tec assault rifle was the same one used by the defendant, and to acknowledge that the defendant knew the police had subsequently recovered the murder weapon. Rivera, however, had both a motive to testify falsely and credibility issues.

*Id.* at 545-46.

67. On March 11, 2024, the jury returned a verdict of not guilty. After spending eleven years in prison, Mr. Raynor was released.

### IV.    Mr. Raynor Suffered Damages During His Eleven Years in Prison

68. Mr. Raynor's time in prison was emotionally and physically scarring. Life was dehumanizing and he was routinely strip-searched by guards.

69. While he was incarcerated, he suffered severe medical problems, so much so that he was compelled to file a claim of deliberate indifference in this Court. *See Donald Raynor v. Ingrid Feder, et al.*, 3:20-cv-1343 (SVN). As alleged in the complaint, Mr. Raynor suffered from a shoulder dislocation that went untreated by the Department of Corrections. Despite repeated requests for medical care, Mr. Raynor was delayed in receiving that care, and ultimately had to undergo three surgeries to remedy the issue.

70. Mr. Raynor has also suffered from high cholesterol and high blood pressure while incarcerated, but his wrongful conviction resulted in delays in receiving appropriate treatment.

71. Mr. Raynor lost family members and friends. His relationship with his family, including his minor child, suffered as he missed out on major milestones.

72. Mr. Raynor lost his home that he had purchased, as the arrest required him to sell it for legal fees and costs.

73.    Mr. Raynor now seeks compensation for the deprivation of years of his freedom,[6] for the physical and emotional pain he suffered in prison and will continue to suffer for the rest of his life, and for the joys of life that he missed.

## FIRST CAUSE OF ACTION

**42 U.S.C. §1983 – Withholding/Suppression of *Brady* Material: Rivera Statement
(Against Defendants Siemionko, Plourde, Rostkowski, Jacobson,
John Jane Does #1-10)**

74.    Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

75.    Defendants Siemionko, Plourde, Rostkowski, Jacobson, and John and Jane Does #1-10, acting individually and in concert, failed to disclose exculpatory information within their possession and/or knowledge to the prosecutor in time for its effective use at Plaintiff's criminal trial, and/or failed to intervene to prevent fellow officer's failure to do so.

76.    The withheld and/or suppressed exculpatory information included, but was not limited to, Rivera's 2009 statement to law enforcement officers that he was not present for any shooting with Mr. Raynor, that he was not aware if anyone had ever been injured.

77.    The suppressed information was favorable to Plaintiff's defense and material to the outcome of Plaintiff's criminal case, in that its disclosure would have led to a reasonable probability of a different outcome and, in fact, did lead to an acquittal once it was available to Plaintiff for the third trial.

78.    The information was suppressed intentionally, in bad faith, and/or with deliberate indifference to Plaintiff's rights.  The Defendants' conduct deprived Mr. Raynor of his clearly

---

[6] Following his conviction at the second trial, Mr. Raynor felt compelled to resolve his outstanding cases.  Mr. Raynor pled guilty under the *Alford* doctrine to firearms offenses and was sentenced to five years to run concurrent to the sixty-year sentence imposed following his conviction for Delano Gray's murder.

established constitutional right to due process of law and a fair trial in connection with the cross-examination of Rivera, the only proffered eyewitness.

79.     Defendants performed the above-described acts within the scope of their employment with the HPD.

80.     The Defendants performed the above-described acts under color of state law, intentionally and with deliberate indifference to Mr. Raynor's clearly established constitutional rights.

81.     No reasonable officer would have believed this conduct was lawful.

82.     As a result of Defendants' suppression of material exculpatory or impeachment information and/or failure to intervene to prevent the suppression of material exculpatory or impeachment information, Plaintiff was deprived of liberty and suffered the damages hereinbefore alleged.

<u>**SECOND CAUSE OF ACTION**</u>

**42 U.S.C. §1983 – Violation of *Brady*, Omissions and Misrepresentations in the Arrest Warrant (Against Defendants Rostkowski and Siemionko)**

83.     Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

84.     Defendants Rostkowski and Siemionko's omissions and misrepresentations in the arrest warrant affidavit causing the arrest and prosecution of the Plaintiff, which were made with deliberate and/or reckless disregard as to their falsity and which were material, violated the Plaintiff's clearly established constitutional right to due process under the rule of *Brady v. Maryland* and its progeny.

85.     In particular, Defendants Rostkowski and Siemionko made misrepresentations and omissions, including but not limited to, the fact that Rivera had previously told law enforcement

20

that he was not present for any shootings and that he did not know if anyone was injured; and omitted pertinent details of the Baltimore Street shooting, including Parker's initial failure to identify any suspect and the discrepancy between her description of the suspects and Mr. Raynor.

86.     The Defendants' failures described above were objectively unreasonable.

87.     As a direct and proximate result of Defendants Rostkowski and Siemionko's omissions and misstatements in the arrest warrant affidavit, Plaintiff was deprived of liberty and suffered the damages hereinbefore alleged.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983 – Failure to Intervene
### (Against Defendants Siemionko, Plourde, Rostkowski, Jacobson, John and Jane Does #1-10)

88.     Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

89.     By their conduct and under color of state law, Defendants Siemionko, Plourde, Rostkowski, Jacobson, and John and Jane Does #1-10, acting within the scope of their employment with the HPD, had opportunities to intercede on behalf of Mr. Raynor to prevent and/or rectify the deprivation of his liberty without due process of law, but, due to their intentional conduct and/or deliberate indifference, failed to do so.

90.     These Defendant's failures to intercede violated Mr. Raynor's clearly established constitutional right to be free from police misconduct, and not to be deprived of exculpatory information.  No reasonable police officer would have believed that failing to intercede to prevent and/or rectify the aforesaid withholding of exculpatory evidence, and omissions and misrepresentations in the arrest warrant, was lawful.

91.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Raynor's damages as described above.  Defendants knew,

should have known, and/or were deliberately indifferent to the fact that their conduct would result in Mr. Raynor's wrongful arrest, prosecution, conviction, and incarceration.

## FOURTH CAUSE OF ACTION

### 42 U.S.C. §1983 – Withholding/Suppression of *Brady* Material
### (Against Defendant Stephenson)

92.     Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

93.     The GRC search results, bench notes, and invoices of James Stephenson are exculpatory evidence.  Had they been disclosed to the Plaintiff, there would have been at least a reasonable probability of a different outcome at his second trial.  Defense counsel would have been able to cross-examine Stephenson about why the database was queried on multiple occasions, why the 2007 measurements did not match the Kel-Tec rifle in the GRC database, and whether Stephenson worked backward to manipulate measurements to ensure a match to the Kal-Tec rifle, as this testimony clearly bolstered Rivera's story.

94.     At all relevant times, Stephenson was acting on behalf of law enforcement and as an arm of the prosecution team.  He had a duty to give exculpatory evidence to the prosector so it could be disclosed to the defense.

95.     Upon information and belief, Stephenson did not provide all of his bench notes, GRC search results, and invoices to the State's Attorney's Office.  Instead, he withheld them and deprived Mr. Raynor of the opportunity to utilize this exculpatory evidence at trial.

96.     Stephenson acted under pretense and color of state law.  His acts beyond the scope of his jurisdiction, without authority of law, and in abuse of his powers.  He acted with the specific intent to deprive Plaintiff of his constitutional rights.

97.    As a result of Stephenson's failure to disclose these documents, Plaintiff was unaware during his trial that Stephenson manipulated the margin of error to make his conclusions fit the testimony of the State's key witness.

98.    As a direct and proximate results of Stephenson's misconduct and abuse of authority, Plaintiff suffered the damages hereinbefore alleged.

## FIFTH CAUSE OF ACTION

**42 U.S.C. § 1983 – Fourth, Fifth, and Fourteenth
Amendments – Municipal Liability
(Against Defendant City of Hartford)**

99.    Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

100.    The Hartford Police Department had a consistent and widespread practice of suppressing exculpatory information in serious felony cases, which constitutes a municipal custom or usage.

101.    The City and its municipal policymakers were deliberately indifferent to the suppression of exculpatory information and omission of exculpatory information from arrest warrant applications, including but not limited to in this particular case.

102.    In this case, the City and its municipal policymakers participated in or disregarded the misconduct of the defendants, acquiescing in and/or ratifying their misconduct and refusing to train, supervise, investigate, discipline, or put an end to these practices described above.

103.    The municipal customs or usages and deliberate indifference described herein caused the Plaintiff's damages.

104.    As a result of Defendants' failure to intervene, Plaintiff was deprived of liberty and suffered the damages hereinbefore alleged.

## SIXTH CAUSE OF ACTION

**Negligence**
**(Against Defendants Siemionko, Plourde, Rostkowski,**
**Jacobson, Stephenson, and John and Jane Does #1-10)**

105.    Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

106.    Defendants Siemionko, Plourde, Rostkowski, Jacobson, Stephenson, and John and Jane Does #1-10, owed Plaintiff duties in their investigation of a crime in which he was the primary suspect, including but not limited to duties to exercise reasonable case in their investigation; to reasonably pursue and disclose exculpatory evidence, including as required by statute; to refrain from fabricating evidence; to conduct fair and nonsuggestive identification procedures; and/or to intervene to prevent other law enforcement officers from engaging in misconduct.

107.    Defendants Siemionko, Plourde, Rostkowski, Jacobson, Stephenson, and John and Jane Does #1-10 breached these duties by their conduct set forth above, including but not limited to:

      a.   Failing to disclose exculpatory evidence as required by Conn. Gen. Stat. 54-86c(c), including but not limited evidence related to Rivera and Stephenson;

      b.   Failing to intervene to prevent other officers from fabricating evidence or using fabricated evidence, including but not limited evidence related to Rivera and Stephenson;

108.    As a result, Plaintiff suffered the damages alleged herein.

## SEVENTH CAUSE OF ACTION

**Negligent Infliction of Emotional Distress**
**(Against Defendants Siemionko, Plourde, Rostkowski,**
**Jacobson, Stephenson, and John and Jane Does #1-10)**

109.    Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

110.    Defendants Siemionko, Plourde, Rostkowski, Jacobson, Stephenson, and John and Jane Does #1-10 knew or should have known that their negligent conduct in investigating Plaintiff and pursuing his criminal prosecution, as set forth in the Sixth Cause of Action, carried an unreasonable risk of causing emotional distress and that such distress might result in illness or bodily harm.

111.    Plaintiff suffered severe and extreme emotional distress which was reasonable and foreseeable in light of the conduct of Defendants Siemionko, Plourde, Rostkowski, Jacobson, Stephenson, and John and Jane Does #1-10.

### EIGHTH CAUSE OF ACTION

### Indemnification-Conn. Gen. Stat. § 7-465
### (Against Defendant City of Hartford)

112.    Plaintiff repeats and realleges the above paragraphs as if fully set forth here.

113.    Defendants Siemionko, Plourde, Rostkowski, Jacobson, Stephenson, and John and Jane Does #1-10 were HPD detectives acting in the performance of their duties within the scope of their employment by Defendant City of Hartford and under color of law.

114.    Defendants Siemionko, Plourde, Rostkowski, Jacobson, Stephenson, and John and Jane Does #1-10 infringed on Plaintiff's civil rights and caused physical damages to his person and property while performing their duties and acting within the scope of their employment.

115.    Defendants Siemionko, Plourde, Rostkowski, Jacobson, Stephenson, and John and Jane Does #1-10 breached these duties by their conduct set forth above.

116.    As a result, Plaintiff suffered the damages alleged herein.

117.    Defendant City of Hartford is liable for those damages under Conn. Gen. Stat. § 7-465.

## NINTH CAUSE OF ACTION

**Article First, §§ 7, 8 and 9 of the Connecticut Constitution**
**(Against Defendants Siemionko, Plourde, Rostkowski,**
**Jacobson, Stephenson, and John and Jane Does #1-10)**

118.    Plaintiff realleges and repeats the above allegations as if fully set forth here.

119.    Defendants Siemionko, Plourde, Rostkowski, Jacobson, Stephenson, and John and Jane Does #1-10 caused Plaintiff to be wrongfully arrested, charged, prosecuted, convicted, and incarcerated.  By their conduct set forth above, they withheld exculpatory evidence, fabricated evidence, and failed to conduct an adequate investigation.

120.    As a direct and proximate result of their unlawful acts and omissions, Plaintiff suffered the damages alleged herein.

## TENTH CAUSE OF ACTION

**Direct Action – Conn. Gen. Stat. § 52-557n**
**(Against Defendant City of Hartford)**

121.    Defendants Siemionko, Plourde, Rostkowski, Jacobson, and John and Jane Does #1-10 were police detectives acting within the scope of their employment and official duties with Defendant City of Hartford and under color of law.

122.    Defendants Siemionko, Plourde, Rostkowski, Jacobson, and John and Jane Does #1-10 owed Plaintiff a duty to exercise reasonable care in their investigation of crimes and to reasonably pursue and disclose exculpatory evidence

123.    Defendants Siemionko, Plourde, Rostkowski, Jacobson, and John and Jane Does #1-10 breached these duties by their conduct set forth above.

124.    Even to the extent that Defendants Siemionko, Plourde, Rostkowski, Jacobson, and John and Jane Does #1-10 were performing discretionary functions, they disregarded the risk of imminent harm to Mr. Raynor, an identifiable person.   Defendants Siemionko, Plourde,

Rostkowski, Jacobson, and John and Jane Does #1-10 were obligated before and during Plaintiff's trials to disclose exculpatory evidence to him.

125.    In the alternative, Defendants Siemionko, Plourde, Rostkowski, Jacobson, and John and Jane Does #1-10 acts involved malice, malicious intent to vex or trouble, and/or intent to injure.

126.    As a direct and proximate result of Defendants Siemionko, Plourde, Rostkowski, Jacobson, and John and Jane Does #1-10's acts and omissions, Plaintiff suffered the damages alleged herein.

127.    Defendant City of Hartford is liable for those damages under Conn. Gen. Stat. § 52-557n.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court grant the following relief against Defendants as follows:

1.    Compensatory damages as to all Defendants in an amount to be determined at trial;

2.    Punitive damages in an amount to be determined at trial as to all Defendants, except as to Defendant City of Hartford;

3.    Pre- and post-judgment interest to the fullest extent permitted by law;

4.     Reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

5.    Such other and further relief as the Court may deem just and proper.

Dated:  New Haven, CT
          March 10, 2026

                              Respectfully submitted,

                              The Plaintiff,
                              DONALD RAYNOR

                              By His Attorneys:

                      By:     _/s/ *Allison M. Near*_____
                              Allison M. Near (ct27241)
                              Rosemarie Paine (ct15694)
                              Jacobs & Dow, LLC
                              350 Orange Street
                              New Haven, CT 06511
                              Tel. (203) 772-3100
                              Fax (203) 772-1691
                              Email: anear@jacobslaw.com
                                        rpaine@jacobslaw.com